## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| RODNEY DOTSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:23-cv-2147-TLP-cgc |
| v. | ) | |
| | ) | |
| FAYETTE COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

Plaintiff Rodney Dotson's service dog ran away during a storm.  Then Fayette County officials collected the dog, held it for a period, and adopted the dog to another family.  Plaintiff now seeks the return of his dog.  To that end, he sued Fayette County for allegedly violating his Fourteenth Amendment rights and the Americans with Disabilities Act ("ADA"), among a handful of state laws.  The County now moves to dismiss Plaintiff's claims, arguing that Plaintiff has not plausibly pleaded the elements of his claims.  (ECF No. 36.)  For the reasons explained below, the Court **GRANTS** the Motion to Dismiss.  The Court **DISMISSES WITH PREJUDICE** Plaintiff's claims under 42 U.S.C. § 1983 and the ADA, and the Court **REMANDS** Plaintiff's state law claims to Fayette County Circuit Court.

## <u>BACKGROUND</u>

On Friday, March 3, 2023, Mr. Rodney Dotson ("Plaintiff") was away from his home in Fayette County, Tennessee ("Fayette County" or the "County").  (ECF No. 33 at PageID 159.) Plaintiff has Autism Spectrum Disorder, Attention Deficit Hyperactivity Disorder, and Post

Traumatic Stress Disorder, and so he uses a service dog for support.[1]  (*Id.* at PageID 158.)  But

Plaintiff left his service dog ("Bully") collared and tethered outside his home while he was

away.[2]  (*Id.*)  Overnight, a storm frightened Bully, and Bully pulled free from his tether and ran

away.  (*Id.* at PageID 159.)  Plaintiff returned home and realized Bully was gone.  (*Id.*)  So he

began searching for Bully.  (*Id.*)

    After spending four days on the loose, Bully was found, but not by Plaintiff.  (*Id.* at

PageID 161.)  The Fayette County Sheriff's Office ("Sheriff's Office"), which includes the

Animal Control Department, responded to a good Samaritan's call and rescued Bully.  (*Id.* at

PageID 159, 161.)  While Plaintiff is unsure who picked up Bully, the report from the Sheriff's

Office that Plaintiff attached as an exhibit shows that both Officer Thomas Petrowski and

Animal Control Officer W. West ("ACO West") responded to the scene.  (*Id.*; ECF No. 25-3 at

PageID 115-16.)

    The officer put Bully in his car, photographed him sitting there, and filed a report

summarizing the rescue.  (ECF No. 33 at PageID 161.)  The report said that the dog did not have

"a collar, tags, or microchip."  (ECF No. 25-3 at PageID 117.)  Photos show that Bully did have

on a gray collar but had no identification tag.[3]  (ECF No. 33 at PageID 161–62.)

---

[1] In deciding the Motion to Dismiss, the Court accepts as true that Plaintiff's dog was a service dog.  But the Court notes that Plaintiff is inconsistent in pleading whether the dog is a service dog or an emotional support animal.  (*See* ECF No. 33 at PageID 169.)

[2] Both Plaintiff and the County refer to the dog as "the dog." (*See* ECF Nos. 33, 36-1.)  The Court finds this awkward to read.  In a proposed exhibit, Plaintiff attaches a disclosure from the County where it notes that the dog is "referred to as 'Bully.'"  (ECF No. 25-3 at PageID 118.)  For the ease of the readers, the Court adopts this name and will refer to the dog as Bully.

[3] The Court observes that there is no visible identification tag in the photos of Bully.  (ECF No. 24-4.)  And there is no obvious embroidery on the collar denoting Bully's owner's name or contact information.  (*Id.*)  The entire collar is not visible, but Plaintiff does not assert that Bully wore any kind of identification beyond a plain collar.

Under Tennessee law "if the dog… is wearing a rabies vaccination tag or other identification, all reasonable efforts shall be made to locate and notify the owners who shall be required to appear within *five* days." Tenn. Code Ann. § 68-8-107. The Court will refer to this as the "five-day policy." But "[i]f any dog… is not wearing a vaccination tag or other identification, the animal may be adopted or destroyed, unless legally claimed by the owner within *three* days." *Id.* The Court will refer to this as the "three-day policy."

On March 10, 2023, three days after Bully's rescue and seven days after his escape, a family adopted Bully. (ECF No. 33 at PageID 161.) As animal control adoption records show, ACO West facilitated the adoption. (ECF No. 25-3 at PageID 118.) Meanwhile, Plaintiff continued his own search. On March 13, 2023, six days after ACO West and Officer Petrowski rescued Bully and ten days after Bully escaped, Plaintiff contacted Sheriff Bobby Riles. (ECF No. 33 at PageID 162.) This began a string of confused communications with county officials. (*Id.*) Sheriff Riles suggested that ACO West was new to the job and out of compliance with Fayette County practice, and that Plaintiff would receive Bully the next day. (*Id.*) Contrary to his promise, the Sheriff did not call back on March 14. (*Id.*)

But Plaintiff continued to communicate with county officials. For example, on March 13, Plaintiff spoke to Sheriff's Officer Kim. (*Id.*) Officer Kim said that the new family did not adopt Bully, but was fostering him, and so Plaintiff could still recover Bully. (*Id.*) Then Plaintiff spoke to ACO West, who contradicted the other two officials. (*Id.* at PageID 162–63.) ACO West said the County took possession and (after 3 days) took ownership of Bully and then adopted Bully out to a new family such that he could not be returned. (*Id.*) Plaintiff alleges that ACO West then spoke to the Fayette County Mayor ("Mayor") about Bully. (*Id.* at PageID 163.)

After consultation with the Mayor, ACO West again told Plaintiff that the County would not return Bully.  (*Id.*)

But despite his statements to Plaintiff, ACO West contacted Bully's new owners and asked if they would be willing to return Bully to Plaintiff.  (*Id.*)  The new owners refused.  (*Id.*)  Plaintiff filed a Tennessee Open Records Act request to obtain the shelter records revealing who adopted Bully.  (*Id.* at PageID 163.)  But Fayette County redacted the adopting family's information.  (*Id.* at PageID 165.)  In an apparent attempt to comfort Plaintiff, the Mayor told Plaintiff that Bully's new home was a good one.  (*Id.*)

Fourteen days after the adoption, Plaintiff sued here naming the "Fayette County Sheriff Department"[4] and John and Jane Doe.  (ECF Nos. 1, 9.)  As part of his Complaint, Plaintiff sought the return of Bully through either "a temporary restraining order or injunctive relief." (ECF No. 9 at PageID 28.)  Under Administrative Order 2013-05, the Court referred this case to Magistrate Judge Charmaine G. Claxton ("Judge Claxton") for management of all pretrial matters.  Judge Claxton then appointed counsel for Plaintiff, meaning Plaintiff is no longer pro se and Administrative Order 2013-05 no longer applies here.  (ECF No. 10.)

The Sheriff's Office moved to dismiss the Complaint, arguing that it is a non-suable entity.  (ECF No. 20-1 at PageID 60–61.)  The Sheriff's Office also opposed the request for a temporary restraining order.  (*Id.*; ECF No. 21.)  In response to the Motion to Dismiss, Plaintiff withdrew his request for a temporary restraining order and sought the Court's permission to amend the Complaint to add Fayette County as a party.  (ECF Nos. 24, 25.)  In short, Plaintiff sought to add Fayette County as a party and to keep the "Sheriff's Department" as a party "out of an abundance of caution."  (ECF No. 25 at PageID 87.)

---

[4] The proper name for this entity is the Fayette County Sheriff's Office.  (*See* ECF No. 25-3.)

The Court referred the Motion to Dismiss to Judge Claxton for report and recommendation.  (ECF No. 23.)  While the Sheriff's Office opposed Plaintiff's request to amend the Complaint and repeated its arguments in its Motion to Dismiss, Judge Claxton advised denying the Motion to Dismiss and allowing Plaintiff to name Fayette County as a Defendant rather than the "Fayette County Sheriff Department."  (ECF Nos. 26, 27.)  This Court adopted Judge Claxton's Report and Recommendation ("R&R").  (ECF No. 28.)  In the Order adopting the R&R, the Court clarified that the only correct party here is Fayette County.  (*Id.*)

But Plaintiff failed to file his Amended Complaint within the allotted time or to serve Fayette County, so Fayette County moved to dismiss the case.  (ECF No. 30-1.)  This Court ordered Plaintiff to file his Amended Complaint within ten days.  (ECF No. 32.)  And Plaintiff complied.  (ECF No. 33.)  Plaintiff removed the "Fayette County Sheriff Department" and John and Jane Doe from his Complaint but brought claims against both Fayette County and the "Fayette County Sheriff's Office."  (*Id.*)  As Plaintiff only had permission to include Fayette County as a Defendant in the Amended Complaint, the Court considers Fayette County as the sole Defendant here.[5]  (*See* ECF No. 28 at PageID 146.)

As part of the Amended Complaint, Plaintiff requested a temporary restraining order.  (ECF No. 33.)  Fayette County opposed and then moved to dismiss this case again, arguing that Plaintiff failed to state a claim for which relief could be granted.  (ECF No. 36.)  After an Order

---

[5] Indeed, "[D]istrict courts in Tennessee have frequently and uniformly held that police departments and sheriff's departments are not proper parties to a § 1983 suit."  *Grace v. City of Ripley*, No. 2:16-CV-02395-JPM-DKV, 2017 WL 835206, at *5 (W.D. Tenn. Mar. 2, 2017).  And Plaintiff's ADA retaliation claim against the Sheriff's Office would fail for the same reasons it fails against the County.

to Show Cause and an extension, Plaintiff responded in opposition.  (ECF Nos. 38, 45, 46.)  The

County replied.  (ECF No. 47.)  This Court now considers this third Motion to Dismiss.[6]

Plaintiff makes many claims under both state and federal law, including claims under 42

U.S.C. § 1983 and the ADA.  The Court first sets out the legal standard then turns to Plaintiff's

claims.

## LEGAL STANDARD

When evaluating a 12(b)(6) motion to dismiss, courts apply the standards of Fed. R. Civ.

P. 8 and 12(b)(6) as construed in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp v.

Twombly*, 550 U.S. 544 (2007).  Rule 8(a)(2) requires only a "short and plain statement of the

claim showing that the pleader is entitled to relief," thus giving the defendant "fair notice of what

the claim is." *Twombly*, 550 U.S. at 555 (citation omitted).  But the plaintiff must provide more

than "labels and conclusions" or "a formulaic recitation of a cause of action's elements." *Id.*

Simply put, "to survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

(quoting *Twombly*, 550 U.S. at 570).  A claim is "plausible" when the "plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.*

When evaluating plausibility, a court must "construe the complaint in the light most

favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in

favor of the plaintiff." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 466 (6th Cir. 2022), *cert denied*,

142 S.Ct. 444 (2022) (citation omitted).  But the court need not accept "legal conclusions or

unwarranted factual inferences." *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659 (6th Cir.

---

[6] The Court **DENIES** the second Motion to Dismiss as **MOOT**.

2021) (quoting *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017)).

"[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," are not enough. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *Arsan v.

Keller*, 784 F. App'x 900, 909 (6th Cir. 2019) (quoting *Commercial Money Ctr. v. Ill. Union

Ins.*, 508 F.3d 327, 336 (6th Cir. 2007)).

Lastly, when reviewing a motion to dismiss, the court generally restricts its review to the

facts of the complaint. *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022). Still,

"a court may consider exhibits attached to the complaint, public records, items appearing in the

record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are

referred to in the complaint and are central to the claims contained therein."[7] *Bray v. Bon

Secours Mercy Health, Inc.*, 97 F.4th 403, 410 (6th Cir. 2024).

## <u>ANALYSIS</u>

The Court evaluates whether Plaintiff's claims are plausible below.

## I.  Due Process and § 1983 Claims

The Fourteenth Amendment prohibits "any State [from] depriv[ing] any person of life,

liberty, or property without due process of law." U.S. Const. amend. XIV. And 42 U.S.C. §

1983 allows citizens to vindicate their Fourteenth Amendment rights by suing "any person

who… subjects or causes to be subjected, any citizen of the United States or other person within

the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws." 42 U.S.C. § 1983.

---

[7] Plaintiff attached proposed exhibits to his Motion to Amend the Complaint. (ECF No. 25.) But when the Court granted leave to amend the Complaint, Plaintiff attached none of them to the Amended Complaint. (ECF No. 33.) The Court considers the exhibits despite Plaintiff's failure to properly attach them because he refers to them in the Complaint.

But Plaintiff asserts in one Count that the County violated 42 U.S.C. § 1983 and in a separate Count says the County abrogated his Fourteenth Amendment Due Process rights.[8]  (*Id.* at PageID 165, 171.)  As § 1983 is the procedural vehicle to bring a Fourteenth Amendment claim, the Court considers these Counts together.  *Lindsey v. Memphis*, No. 09-2448-STA, 2010 U.S. Dist. LEXIS 16845 at *11 (W.D. Tenn. Feb. 24, 2010) (citing *Graham v. Connor*, 490 U.S. 386, 393 (1989)).  And "[t]o prove a § 1983 procedural-due-process claim, a party must show: (1) that she has a 'life, liberty, or property interest requiring protection under the Due Process Clause,' (2) that the government 'depriv[ed] [her] of that interest,' and (3) that the government carried out that deprivation 'without adequate process.'"  *Williams v. Shelby Cnty., Tenn., Bd. of Educ.*, No. 22-5591, 2025 WL 1370082, at *8 (6th Cir. May 12, 2025) (*Fields v. Henry County*, 701 F.3d 180, 185 (6th Cir. 2012)).

Although § 1983 reads that it holds liable "any person" who deprives another of a constitutional right, courts have extended liability to municipalities as well.  *Hall v. Navarre*, 118 F.4th 749, 756 (6th Cir. 2024).  But a municipality is not liable for merely employing a tortfeasor.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  Instead, a municipality like Fayette County is liable only when it is the "moving force" behind the injury.  *Alman v. Reed*,

---

[8] Plaintiff also seems to bring a § 1983 claim based on the County allegedly violating the Tennessee Open Records Act.  (ECF No. 33 at PageID 166.)  But violations of state laws do not give rise to actions under § 1983.  *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 313 (6th Cir. 2005) (citing *Benn v. Universal Health Sys., Inc.,* 371 F.3d 165, 174 (3d Cir. 2004)).  And in his Amended Complaint, Plaintiff does not identify a Constitutional right he was deprived of associated with any Tennessee Open Records Act violation.  (ECF No. 33 at PageID 165–67.)  In his response to the Motion to Dismiss, Plaintiff argues that the County officials not following the Open Records Act "supports the theory that procedural due process was violated," arguing he is now unable to bring a replevin action against Bully's adoptive family.  (ECF No. 46 at PageID 254.)  But for the reasons explained in Footnote 12 below, the post-deprivation procedures, or lack thereof, are not at issue here.  So the Court **DISMISSES** any § 1983 claim based on the Tennessee Open Records Act.

703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397,

404 (1997)).

To determine whether a municipality is liable under § 1983, courts analyze claims under

the *Monell* framework. *See Wright v. City of Euclid*, 962 F.3d 852, 879 (6th Cir. 2020). Because

§ 1983 gives a cause of action for constitutional violations, Plaintiff must first allege that the

County unlawfully deprived him of a constitutional right. *Robertson v. Lucas*, 753 F.3d 606, 622

(6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional

violation."). Then, Plaintiff must show the County was the "moving force" behind the injury by

"connecting" the unconstitutional act to the County. *Coleman v. Hamilton Cnty. Bd. Of Cnty.*

*Comm'rs*, 130 F.4th 593, 599 (6th Cir. 2025). To prove the County is the moving force, Plaintiff

must point to "(1) the existence of an illegal official policy or legislative enactment; (2) that an

official with final decision making authority ratified illegal actions; (3) the existence of a policy

of inadequate training or supervision; or (4) the existence of a custom of tolerance or

acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th

Cir. 2019). And in the third step, Plaintiff must show that his "particular injury was incurred

because of the execution of that policy." *Wright*, 962 F.3d at 880; *Garner v. Memphis Police*

*Dep't*, 8 F.3d 358, 364 (6th Cir. 1993); *Franklin v. Franklin Cnty.*, 115 F.4th 461, 471 (6th Cir.

2024).

### A.     Deprivation of a Constitutional Right

For the § 1983 *Monell* analysis, the plaintiff must first identify the Constitutional right

the municipality denied him. *Smith v. Silvernail*, 2025 U.S. App. LEXIS 750 at *24–25 (6th Cir.

Jan. 13, 2025). Plaintiff alleges here that he "was deprived of his due process rights and the right

to have the opportunity to recover his property" under the Fourteenth Amendment when ACO

West allowed another family to adopt Bully.  (ECF No. 33 at PageID 163, 166–67, 171.)

Because he claims the County deprived him of a property right, the Court must address whether

Plaintiff had a property interest in Bully when he was adopted out.  And in the end, the Court

finds that Plaintiff's property interest in Bully expired before he was adopted.  Although Plaintiff

asserts that his property right in Bully is "undisputed," declaring something "undisputed" does

not make it so.  (*Id.* at PageID 170.)

### 1.    Property Interest

Property interests are created and defined by state law.  *Whaley v. Cnty. of Tuscola ex rel.*

*Tuscola Cnty. Bd. of Comm'rs*, 58 F.3d 1111, 1114 (6th Cir. 1995) (quoting *Bd. of Regents v.*

*Roth*, 408 U.S. 564, 577 (1972)) ("Property interests, of course, are not created by the

Constitution.  Rather they are created and their dimensions are defined by existing rules or

understandings that stem from an independent source such as state law—rules or understandings

that secure certain benefits and that support claims of entitlement to those benefits.").  And

Tennessee law provides that a dog owner's property right in a dog without identification expires

after three days.  *See* Tenn. Code Ann. § 68-8-107 ("If any dog or cat is not wearing a

vaccination tag or other identification, the animal may be adopted or destroyed, unless legally

claimed by the owner within three (3) days.").

Plaintiff does not contend that Bully had an identification or vaccination tag.  (*See* ECF

No. 33.)  In fact, he objects to the County's alleged failure to vaccinate Bully, confirming that

there was no vaccination tag.  (*Id.* at PageID 160.)  Instead, Plaintiff argues that because Bully

had a collar (without a tag with the owner's contact information), the ACO should have

recognized that Bully had an owner.  (*Id.* at PageID 166.)  And Plaintiff adds that Bully's collar

alone imposed a burden on the ACO to hold Bully for five days, rather than three, and to try to contact the owner.[9]  (*Id.*)

But Tennessee law does not preserve an owner's property right in dogs for another two days based on the presence of a collar.  *See* Tenn. Code Ann. § 68-8-107.  Rather, Tennessee preserves the property right in dogs based on "identification."  For example, rabies tags have an "identification number" linked to the owner and must be "attach[ed]… to a collar, which shall be worn at all times."  Tenn. Code Ann. § 68-8-103.

To be sure, Bully had a collar, but the collar did not identify the owner.  And because Plaintiff does not plead that Bully bore identification, he does not plead that he had a property interest in Bully after the three-day mark.[10]  What is more, because Plaintiff identifies no

_____

[9] Plaintiff argues that two other laws imposed a burden on the ACO to contact Plaintiff.  First, he points to Section Nine of the Fayette County Animal Control Ordinance.  (ECF No. 33 at PageID 160.)  But Section Nine authorizes impoundment and makes no mention of contacting owners. (ECF No. 25-2 at PageID 113.)  It says that "all stray animals may be captured, confined, impounded, and returned to the animal owner, *if known*, or disposed of (euthanized or adopted out) in accordance with the provisions of this Act."  (*Id.* (emphasis added).)  Second, he points to Tennessee state law.  He contends that "Tenn. Code Ann. 44-17-304(c) requires Fayette County to take affirmative action to locate the dog's owner" when "a public or private agency, animal shelter, or other facility that knows or should know that a non-livestock animal has an owner under subsection (a) must make a reasonable effort to locate and notify the animal's owners within forty-eight (48) hours of the time that the…agency…takes custody of the animal…"  (*Id.*)  But this law concerns euthanasia (it is part of the Non-livestock Animal Humane Death Act) and applies when a "public or private agency, animal shelter or other facility… knows or should know [that a non-livestock animal], by identification or vaccination tags, personal knowledge, or otherwise, has an owner."  Tenn. Code Ann. § 44-17-304.  As the reasonable effort required hinges on knowing the dog has an owner, this Tennessee state law does not change Plaintiff's outcome.  More simply, it does not apply to the situation.  The County did not euthanize Bully but adopted him to new owners.

[10] The Sixth Circuit has recently analyzed a dog owner's property interest in the context of a § 1983 claim and found that under Michigan law, the plaintiff retained a possessory interest in unlicensed dogs such that the state could not seize them without due process.  While executing a search warrant for a misdemeanor violation of Detroit's marijuana law, police officers shot and killed the homeowner's three dogs.  *Smith v. City of Detroit*, 751 F. App'x 691, 692–94 (6th Cir. 2018).  The dogs were unlicensed, and so the district court found that the dogs' owner had forfeited his property interest in the dogs.  *Id*. at 694.  Because the court found the owners

property interest, he cannot identify the deprivation of property, meaning he cannot show that he

was deprived of property without due process under the Fourteenth Amendment.  And since

Plaintiff was not deprived of a constitutional right, his § 1983 claim fails here.

### 2.    Due Process

But even if Plaintiff had a property interest in Bully at the time that Bully was adopted,

Plaintiff still cannot show that he was deprived of due process.  To show he was provided

insufficient process, Plaintiff must establish "(1) the existence of a protected property interest at

issue, (2) a deprivation of that protected property interest, and (3) that he or she was not afforded

adequate procedures."  *Crandall v. Newaygo City*, No.-23-1653, 2024 U.S. App. Lexis 10784 at

*8 (6th Cir. May 1, 2024).  So even if Plaintiff could show that he were deprived of a property

interest, he would still have to show that he was not afforded adequate procedures.

To determine whether there was adequate due process, the Court must balance the private

interest at risk, the government's interest in the case, the risk of deprivation under the current

procedures, and the probable value of any other safeguards.  *Id.*  (citing *Matthews v. Eldridge*,

424 U.S. 319 (1976)).  Plaintiff claims the County "did not post the dog on social media, it did

not reach out to the neighbors, and it did not wait."  (ECF No. 33 at PageID 160.)  But Plaintiff

---

forfeited their property interest, they held that the dogs' "seizure" by the police officer was
reasonable under the Fourth Amendment.  *Id*.  But the Sixth Circuit disagreed and reversed
summary judgement.  *Id.* at 696.  In its reasoning, the Sixth Circuit turned to Michigan law,
which provides dog owners process "before their unlicensed dogs are killed."  *Id.*  The Sixth
Circuit explained that "[b]y guaranteeing process to dog owners before their unlicensed dogs are
killed, Michigan law makes clear that the owners retain a possessory interest in their dogs."  *Id.*
The laws in Tennessee are different.  Here a lost dog without identification can be adopted out or
euthanized after three days without notice or a hearing.  Tenn. Code Ann. § 68-8-107.  This
means that three days after the county officials picked up Bully, Plaintiff no longer had a
possessory interest in him.  Also of note, Bully fled into the public space and into the realm of
the police power, whereas in *Smith*, the power of the state entered the person's home, acted
ignorantly of Michigan law, and only later retrofitted state law to justify the officers' actions.

was not entitled to this extra process.  Simply put, county officials holding Bully for three days

was sufficient here.

Taking the last two elements first, the Court finds that the current procedures under

Tennessee law are adequate to protect a dog owner's interests.  The Tennessee legislature

enacted Tenn. Code Ann. § 68-8-107 in 2005, and this Court has not found a single example of

that statute being cited in a case over the past twenty years.  While laws are not beyond reproach

merely for being old, the lack of challenge suggests that this statute provides enough time for

dog owners to retrieve their companions.  Indeed, the Court expects that a dog owner would try

to reclaim their pet within three days.  Plaintiff waited 10 days to contact the County here.

Moreover Plaintiff contends that he was entirely unaware of the existence of Animal Control in

Fayette County.  (ECF No. 33 at PageID 169.)  So it is unclear what additional value posting

dogs on social media would provide.  The Court finds it implausible that Plaintiff, or someone in

his position, would have received notice of his dog's rescue by the social media account of an

entity that he did not know existed.

But even more to the point, by the time Bully was adopted (seven days after his escape)

the County's interest outweighed Plaintiff's interests.  Even if Plaintiff had a property interest in

Bully three days after the County found him, that interest would be minimal.  This is especially

true given the facts here.  By the time the new owners took possession, Plaintiff had not had

Bully for a week.  (ECF No. 33 at PageID 162.)  And the private interest wanes when the dog is

on the lam.  *See Altman v. City of Higher Point*, 330 F.3d 194, 205–06 (4th Cir. 2003) ("Put

simply, while we do not denigrate the possessory interest a dog owner has in his pet, we do

conclude that dog owners forfeit many of those possessory interests when they allow their dog to

run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to

become simply a personal effect and takes on the nature of a public nuisance.").

    With that in mind, it is a longstanding principle that states have weighty interests in

regulating dogs.  The Supreme Court held that "property in dogs… may be subjected to peculiar

and drastic police regulations by the state without depriving their owners of any federal right."

*Nicchia v. People of State of New York*, 254 U.S. 228, 230-31 (1920); *see also Sentell v. New*

*Orleans & C.R.Co.*, 166 U.S. 698, 704 (1897) ("Even it were assumed that dogs are property in

the fullest sense of the word, they would still be subject to the police power of the state, and

might be destroyed or otherwise dealt with, as in the judgement of the legislature is necessary for

the protection of its citizens.").  Further, caring for stray dogs is expensive for the state and the

conditions of shelters are not ideal for the health and wellbeing of dogs.  *See, e.g.*, *Lamare v.*

*North Cnty. Animal League*, 170 Vt. 115, 123 (1999) (citation omitted).

    So Tennessee's interest in Bully's welfare far outweighs Plaintiff's potential limited

property interest.  And on balance, the County provided sufficient process by holding the dog for

three days to allow Plaintiff an opportunity to reclaim Bully.  Moreover, *Lunon v. Botsford*, 946

F.3d 425, 430 (8th Cir. 2019) is instructive here.  In *Lunon*, the North Little Rock Animal Shelter

failed to scan for a microchip before it adopted out a stray dog ("Bibi") to a new family.  *Id.* at

428.  The shelter held Bibi for the statutory period that Arkansas law required but made no

affirmative effort to contact the owners.[11]  *Id.*  The Eighth Circuit held "that affirmative pre-

deprivation notice [was] not constitutionally required in this situation." *Id.* at 431.  Put

---

[11] In Arkansas, the statutory period was five days.  *Lunon*, 946 F.3d at 428.  In Tennessee, it is
three days.  The court does not view this to be a relevant difference.  Indeed, the Court expects
the owner of an escaped dog would contact animal control within three days.  Plus Bully was
gone for 10 days before Plaintiff contacted the County.

differently, in *Lunon*, even when there was a way to scan the microchip and contact the original

owner, the court held the original owner had no due process claim because the state had no

affirmative duty to contact potential owners when it possesses a stray dog.  Because Plaintiff has

not alleged plausibly that the County deprived him of adequate due process, the claim fails.[12]

B.    **Moving Force**

As described above, Plaintiff fails to show he was deprived of due process.  But

Plaintiff's § 1983 claim fails for another reason.  That is, he fails to connect the alleged

deprivation of rights to the County.  A plaintiff connects an alleged deprivation to the

government entity by pointing to an unconstitutional policy, by identifying a final policymaker

who deprived them of a constitutional right, by alleging the existence of an unconstitutional

custom, or by demonstrating that the government failed to train its officers.  Plaintiff's claim is

unclear.  Perhaps he argues that the County is liable under § 1983 under all four possible

theories, and the Court addresses each argument in turn.

1.    **Unconstitutional Policy**

Plaintiff may argue that the County was a moving force behind the alleged due process

violation by alleging that there was "an illegal official policy or legislative enactment." *Jackson*,

---

[12] The County argues that because state law provides an adequate remedy here, a § 1983
procedural due process claim is improper.  (*See* ECF No. 36-1 at PageID 190.)  And it is true that
courts "may dismiss a procedural due process claim if the state provides an adequate
postdeprivation remedy and (1) the deprivation was unpredictable or random; (2) predeprivation
process was impossible or impracticable; and (3) the state actor was not authorized to take the
action that deprived the plaintiff of property or liberty." *Johnson v. City of Saginaw*, 980 F.3d
497, 508 (6th Cir. 2020) (citation omitted).  But, accepting all well-pleaded factual allegations as
true, the Court finds that adopting Bully to a new family after three days was not unpredictable
or random.  *See* Tenn. Code Ann. § 68-8-107.  Likewise, some form of process before the
adoption would not have been impossible or impracticable.  So the availability of postdeprivation
remedies is not relevant here.  But, in the event the Court is incorrect on this point, the Court
notes that Plaintiff has failed to plead that postdeprivation remedies are inadequate here and has
instead focused on predeprivation procedures.  (*See* ECF No. 33.)

925 F.3d at 828. And Plaintiff tries to take this route by asserting that he was "deprived of his constitutional right pursuant to Fayette County's policy." (ECF No. 33 at PageID 167.) But when he argues that the relevant Tennessee laws are unconstitutional for failing to provide him due process, this contention fails for the reasons discussed above.

In any event, it seems that the crux of Plaintiff's argument is that various Fayette County actors improperly applied the Tennessee laws about stray animals to Bully.[13] (*Id.* at PageID 166, ¶ 77.) Plaintiff claims that the actors violated the stray dog laws by:

> [F]ailing to take any actions to locate the dog's owner, by 'fostering' the dog when such is not set out by ordinance, by not holding the dog, which had a collar and was clearly not a stray, for the requisite time period, by not having the dog vaccinated…, and by the Sheriff, specifically in charge of animal control, representing to Mr. Dotson that his dog would be returned, and the Mayor, who does not control the statute, overriding the Sheriff in permitting the dog, which had been erroneously adopted out, to stay with the adopting individuals.

(*Id.* at PageID 166.)

In essence, Plaintiff's claim seems to boil down to this: Fayette County actors applied the three-day policy to Bully when they should have instead applied the five-day policy.[14] In other words, the majority of his § 1983 claim is not that the three-day policy is unconstitutional, but that ACO West improperly applied the policy to Bully. For starters, even accepting all well-pleaded factual allegations as true, the Court is unconvinced Fayette County actors misapplied

---

[13] Even if Plaintiff alleged that the policy were unconstitutional, he might be unable to connect it to the municipality. The law is a state law, not a municipal one. And the Sixth Circuit has not decided its position in the circuit split over whether municipalities may be liable under § 1983 for enforcing a state law. *Jordan v. Lee*, No. 3:19-cv-00907, 2022 U.S. Dist. LEXIS 73107 at *52–54 (M.D. Tenn. April 21, 2022). But other circuits have stated that municipalities should not be held liable for state laws because "it is difficult to imagine a municipal policy more innocuous and constitutionally permissible… than the 'policy' of enforcing state law." *Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 791–92 (7th Cir. 1991).

[14] Two more days would have done Plaintiff no good anyway. Remember he did not call the Sheriff until ten days after Bully left and another six days after the officers recovered Bully.

the policy.  But even if they had misapplied the policy, Plaintiff cannot connect Fayette County

to the allegedly unconstitutional actions.[15]  Indeed, "a local government may not be sued under §

1983 for an injury inflicted solely by its employees or agents."  *Franklin v. Franklin Cnty.*, 115

F.4th 461, 470 (6th Cir. 2024) (citing *Monell*, 436 U.S. at 694.)  So Plaintiff's claim that Bully

was taken pursuant to an unconstitutional policy fails.

### 2.    Final Policymaker

Plaintiff could also connect the alleged constitutional deprivation to the County by

showing that "an official with final decision making authority ratified illegal actions."  *Jackson*,

925 F.3d at 828; *see also Jocke v. City of Medina*, No. 22-3954, 2023 U.S. App. LEXIS 21029 at

*10 (6th Cir. Aug. 11, 2023) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)

("[M]unicipal liability may be imposed for a single decision by municipal policy makers.").  A

figure is a final policymaker only if their decision is unreviewable.  *Feliciano v. City of*

*Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (citing *City of St. Louis v. Praprotnik*, 485 U.S.

112, 127 (1988)) ("Mere authority to exercise discretion while performing particular functions

does not make a municipal employee a final policymaker unless the official's decisions are final

and unreviewable and are not constrained by the official policies of superior officers.").

Officials become final policymakers through custom, law, or delegation of authority.  *Id.*  And

determining whether a party is a final policymaker is a question of state law.  *Id.*  In sum, the

municipality is liable if the identified final policymaker made the unreviewable decision or

ratified the decision.  *Id.*

Plaintiff identifies many potential final policymakers.  On the one hand, he alleges that

"[ACO] West was permitted to represent the Sheriff as the final policymaking authority."  (ECF

---

[15] Plaintiff does not allege that there is a pattern of County officials not following the policy.

No. 33 at PageID 168.)  On the other hand, he states that "[t]he Mayor, who is the final

decisionmaker for the County, was contacted by ACO West to make the final decision."  (*Id.*)

And the County asserts that Plaintiff identifies the Sheriff as the final policymaker.  (ECF No.

36-1 at PageID 194.)  To that end, Plaintiff does state that ACO West derives authority from the

Sheriff, potentially suggesting that Plaintiff believes the Sheriff is the final policymaker under a

ratification theory.[16]  (ECF No. 33 at PageID 168.)

The Court turns to the facts as alleged to determine whether any of these three officials

are the final policymaker, and if they are, whether they made or ratified a decision that attached

liability to the County.  The Court understands the decision at issue to be the classification of

Bully as a stray subject to the three-day policy, which deprived Plaintiff of another two days to

reclaim Bully.

ACO West apparently made the decision to adopt Bully out to a new family after three

days by recording that Bully had no identification.  (ECF No. 33 at PageID 161.)  But the record

and Plaintiff's own allegations indicate that ACO West was merely exercising discretion and was

subject to the review of superior officers.[17]  Indeed, Plaintiff provided the Animal Control

Ordinance, as adopted by the County in April 2017.  And Section Two of the Ordinance provides

that "[t]he Fayette County Sheriff shall see that the duties of the Animal Control Director, as

described in this ordinance, are carried out."  (ECF No. 25-2 at PageID 111.)

---

[16] Under Rule 8, a Plaintiff must provide "a short and plain statement of the claim showing that
the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While the Court resolves this matter on
the merits, Plaintiff's scattershot approach to pleading in some areas of his Amended Complaint
troubles the Court.

[17] "Discretion to act is not to be confused with policymaking authority; no municipal liability
results where an official merely has discretion to act because subjecting a municipality to
liability in such a situation would be 'indistinguishable' from respondeat superior liability."
*Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993).

What is more, Plaintiff alleges that under this Section, the Sheriff was "in charge of animal control." (ECF No. 33 at PageID 166.) Plaintiff also asserts that "the adopted ordinance giv[es] the Sheriff sole authority to direct Animal Control" and "[a]nimal control is a department of a municipality, here, subject to the unilateral control of the Sheriff by ordinance." (*Id.* at PageID 167.) So accepting Plaintiff's own facts and exhibits as true, ACO West cannot be the final policymaker because his actions were subject to review by the Sheriff and constrained by the official policies of superior officers. *See Adair v. Charter County of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006) (finding that the Director of Public Safety, despite the "considerable influence" of the position and the allegations that his decisions were responsible for the plaintiff's loss of constitutional rights, was not the final policymaker because his decisions were not final); *see also Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001) (holding that an alderman who sat at the top of a city's hierarchy was not a final decisionmaker on an issue because no single alderman could make a decision under the city charter). ACO West, despite making the decision at issue, is not the final policymaker in this case.

The Court now considers whether the Mayor is the final policymaker. The Mayor allegedly agreed with ACO West's decision. (ECF No. 33 at PageID 162–63.) But, as Plaintiff points out several times, the Mayor did not have the authority to act under the statute and did not decide to adopt Bully, as he was not contacted until well after the adoption was completed. (ECF No. 33 at ¶ 25, 47, 49, 63.) While Plaintiff states that "the mayor… is the final decisionmaker for the county," holding a high-ranking position does not mean an official is the final decisionmaker on all issues. *See Waters*, 424 F.3d at 362. Because final policymaker status is a question of state law, the Court finds that the Mayor was not the final policymaker here.

Now the Court considers whether Sheriff Riles is the final policymaker.  ACO West applied the three-day policy to Bully, but his decisions and authority were subject to the review of the Sheriff.  (ECF No. 33 at PageID 167.)  So in theory, the Sheriff, although not the decisionmaker, could connect the decision to the County by ratifying the decision.  *Feliciano*, 988 F.2d at 656 ("[I]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final policy.").  But "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification… [ratification] requires affirmative approval of a particular decision made by a subordinate." *Liptak v. City of Niles*, No. 98-4078, 1999 U.S. App. LEXIS 29984 at *19 (6th Cir. Nov 10, 1999).

Plaintiff alleges the exact opposite of acquiescence, let alone ratification.  According to Plaintiff, during his phone call with the Sheriff, the Sheriff told Plaintiff that ACO West "was brand new, did not know what he was doing, was not doing things in accordance with Fayette County practice, and that adopting or precluding reunion of an owner and their pet was not the Sheriff's standard practice." (ECF No. 33 at PageID 162.)  After that conversation, the Sheriff's Office tried to recover Bully, counter to ACO West's decision.  (*Id.*)  So Plaintiff has failed to show that the Sheriff made or ratified the decision.[18]  So liability cannot attach to the County based on the actions of the Sheriff.

Because Plaintiff failed to allege that a final decisionmaker made or ratified an illegal action, he fails to connect the alleged unconstitutional conduct to the County under the final policymaker theory.

---

[18] The Court need not reach Fayette County's argument that Sheriff Riles was "constrained by official policies of the Fayette County Commission and Tennessee legislative body."  (ECF No. 36-1 at PageID 195.)

### 3.    Custom

Another way to connect the unconstitutional action to the County is by showing "the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson*, 925 F.3d at 838.  To show that a custom of tolerance of acquiescence existed, Plaintiff must show "(1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction." *Wallace v. Coffee Cnty.*, 852 F. App'x 871, 876 (6th Cir. 2021).

Plaintiff seems to be trying to assert a custom claim twice.  He states that "this unconstitutional custom caused Dotson harm." (ECF No. 33 at PageID 168.)  And he states that "Dotson suffered adverse actions when West… made his own custom and policy of when the dog was adopted out and how." (*Id.* at PageID 169.)  But Plaintiff defeats his own claim at the first element for demonstrating custom.  Rather than saying there is a pattern of adopting out dogs before the original owners' property interests expired, he instead points out that ACO West "made up" the policy. (*Id.* at PageID 167.)  And ACO West, Plaintiff says, is "brand new" to the County. (*Id.* at PageID 162.)  By failing to point out a single prior example of county officials allegedly violating people's rights, Plaintiff fails to meet the first element of a custom claim.  For that reason, Plaintiff's third try to connect the action to the municipality fails.

### 4.    Failure to Train

Plaintiff hints at the possibility of a failure to train theory by quoting Sheriff Riles' statement that ACO West was "brand new" and "did not know what he was doing." (*Id.* at PageID 162.)  But this is not enough to allege a failure to train claim.  To show that a municipality is liable for failure to train, Plaintiff must show that "(1) the municipality's training

21

or supervision was inadequate for the tasks that its officers must perform, (2) the inadequacy was the result of the municipality's deliberate indifference, and (3) the inadequacy was closely related to or caused the constitutional injury.'"  *Austin v. Mosley*, No. 23-1425, 2025 U.S. App. LEXIS 3286 at *7 (6th Cir. Feb. 10, 2025) (citing *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-87 (6th Cir. 2020)).  And to show the second prong of deliberate indifference, Plaintiff must show "either (1) prior instances of unconstitutional conduct demonstrating that the City had notice that its training in that particular area was deficient and likely to cause injury, and did not act in response; or (2) a single violation of rights, accompanied by evidence that the City failed to train its employees to handle recurring situations presenting an obvious potential for such a violation."  *Id.* at *8 (citing *Jackson v. City of Cleveland*, 925 F.3d at 836).

Plaintiff makes no allegation about Fayette County's training practices, so any effort to assert a claim here is conclusory.  (See ECF No. 33 at PageID 159–65.)  Moreover, the claim would fail on the deliberate indifference prong because Plaintiff has shown no earlier instances nor shown that this a "recurring situation presenting an obvious potential for such a violation." (*Id.*)  And as noted above, there is a limited property interest in dogs, so there is not an obvious potential for future violations.  Finally, given how long Plaintiff waited to call the Sheriff's Office about Bully, Plaintiff cannot show that ACO West's alleged training deficiencies caused a constitutional deprivation.

### C.    Harm Caused

Finally, to allege a § 1983 claim, Plaintiff must show the harm occurred because of the County's policies or customs.  *See, e.g.*, *Doe v. Clairborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) ("In addition to showing that the [defendant] as an entity 'caused' the constitutional violation, plaintiff must also show a direct causal link between the custom and the constitutional

deprivation; that is [plaintiff] must show that the particular injury was incurred because of the execution of that policy.").  As with the other *Monell* elements, Plaintiff fails to allege this.  Indeed, Plaintiff fails to show that he would be unharmed but for ACO West adopting Bully out after a three-day hold.

The heart of Plaintiff's argument is that Bully should have been held for five days instead of three.[19]  (ECF No. 33 at PageID 167.)  In Plaintiff's recounting of events, county officials collected Bully on March 7, 2023, at 10:20 AM.  (*Id.* at PageID 161.)  Three days later, on March 10, 2023, at about 3:00 PM, a new owner adopted Bully.  (ECF No. 25-3 at PageID 117.)  But if ACO West applied the five-day policy, he could have adopted Bully out on March 12, 2023, at 10:20 AM, after making reasonable efforts to contact the owner.  Plaintiff waited until the next day to call the Sheriff's Office.  (*Id.*)  So those extra two days would have made no difference here.  And given the lack of identification, the ACO West could not have reasonably notified Plaintiff before then.  So even if ACO West held Bully for five days, he still could have

---

[19] Plaintiff also argues that the County had an affirmative duty to make "reasonable efforts" to contact the owner.  (ECF No. 33 at PageID 160.)  Yet the code he cites to support that argument is taken out of context.  Plaintiff says that "Tenn. Code Ann. 44-17-304(c) requires Fayette County to take affirmative action to locate the dog's owner" when "a public or private agency, animal shelter, or other facility that knows or should know that a non-livestock animal has an owner under subsection (a) must make a reasonable effort to locate and notify the animal's owners within forty-eight (48) hours of the time that the…agency…takes custody of the animal…"  (*Id.*)  But this law only applies "before any public or private agency, animal shelter or other facility… euthanizes a non-livestock animal that the facility knows or should know, by identification or vaccination tags, personal knowledge, or otherwise, has an owner."  Tenn. Code Ann. § 44-17-304(a).  Further, the code only holds that "the facility shall be required to hold the animal for at least three (3) full business days from the time it is brought to the facility" before euthanasia.  *Id.*  As the reasonable effort required hinges on knowing the dog has an owner and the property interest only lasts for three days, this Section would not change Plaintiff's outcome.  More simply, it does not apply to the situation.  The County did not euthanize Bully but adopted him to new owners.

adopted Bully to a new family under Tennessee law before Plaintiff contacted the Sheriff.[20]

Therefore, Plaintiff cannot allege nor show that the County's actions deprived him of Bully.

In sum, Plaintiff cannot identify a property interest of which the County deprived him.

Moreover, he cannot show that he received insufficient process. And he fails to connect the

policy to the County and fails to show the policy caused him harm. Accordingly, the Court

**DISMISSES** Plaintiff's § 1983 claim **WITH PREJUDICE**.

## II.    ADA Claim

The Court now turns to Plaintiff's ADA retaliation claim.[21] The ADA forbids

discrimination based on disability and protects access to public life for individuals with

disabilities. 42 U.S.C. § 12101. The ADA defines disability as "a physical or mental

impairment that substantially limits one or major life activities."[22] 29 U.S.C. § 705(9)(B). To

---

[20] Compare the case of *Benjamin v. Town of Islip*, No. 20 CV 56 (ENV)(LB), 2021 WL 8344132, at *13 (E.D.N.Y. Aug. 12, 2021), *report and recommendation adopted*, No. 20-CV-56 (ENV) (LB), 2022 WL 1090608 (E.D.N.Y. Apr. 12, 2022). In *Benjamin*, the plaintiff's Belgian Malinois ("Eto") ran away and was quickly recovered by the defendant's shelter. *Id.* at *2. The next day, the plaintiff went to the shelter and attempted to collect Eto. *Id.* The shelter demanded additional proof of ownership, and when provided with the proof, ignored it. *Id.* at *2–3. After over twenty days and several tries to prove ownership and collect his dog, the plaintiff learned from a non-party that one of the town's law enforcement officers adopted the dog. *Id.* at *3. The defendants argued that the plaintiff lacked standing and could not allege deprivation of a property interest because the dog was lost. *Id.* at *4, 13. The court, however, rejected this theory because plaintiff preserved his possessory interest by trying to collect the dog within the statutorily allowed five days. *Id.* There lies the critical difference: because the plaintiff acted within the statutory period, he retained his property interest.

[21] Some reconstruction of the claim is required. Plaintiff states in his "Count Two: ADA Retaliation" section that "Mr. Dotson has a Title VII claim" and has "made a prima facie case." (ECF No. 33 at PageID 169.) This is unclear. Perhaps Plaintiff means that he made a prima facie case for discrimination under Title VII of the Civil Rights Act. This is commonly known as "Title VII." But he has made no such claim here. Another possibility is that he is referring to a Title within the ADA. But the ADA has no Title VII. So the Court presumes that Plaintiff meant to bring his claim under the ADA's anti-retaliation provision.

[22] The County claims that Plaintiff must plausibly allege that he suffers from a disability protected by the ADA. (ECF No. 36-1 at PageID 197.) This is true when alleging discrimination, but not so for retaliation. *See Kelly v. Graphic Packaging Int'l, LLC*, No. 24-

give the protection teeth, the ADA also prohibits retaliation against those who "oppose[] an act
or practice made unlawful by this chapter." *Kelly v. Graphic Packaging Int'l, LLC*, No. 24-
1400/1599, 2025 U.S. App. LEXIS 4127 at *7 (6th Cir. Feb. 21, 2025) (citing 42 U.S.C. §
12203(a)).

Courts ultimately use the *McDonnell Douglas* burden shifting framework to decide
whether public entities engaged in unlawful retaliation against ADA protected activity. *Id.* at *8.
Under *McDonnell Douglas*, Plaintiff must first allege a prima facie case of retaliation. *Morrissey
v. Laurel Health Care Co.*, 946 F.3d 292, 304 (6th Cir. 2019). Then, if Plaintiff successfully
alleges the prima facie case, the County must give "a legitimate, non-discriminatory reason" for
the adverse action. *Kelly*, 2025 U.S. App. LEXIS at *8. The burden then shifts back to Plaintiff
to show the reason provided is merely a pretext. *Id.*

But at the motion to dismiss stage, Plaintiff must only "allege facts plausibly establishing
that [he] was engaged in protected activity that the defendants were aware of, the defendants
took an adverse action against [him], and there was a causal connection between the protected
activity and the adverse action." *Harmon v. Waterman*, No. 24-5773, 2025 U.S. App. LEXIS
13997 at *9 (6th Cir. June 6, 2025). The Court now turns to each of these elements.

A.    **Protected Activity**

Plaintiff must first allege that he "engaged in protected activity." *Harmon*, 2025 U.S.
App. LEXIS 13997 at *9. Protected activity "typically refers to action taken to protest or oppose

---

1400/1599, 2025 U.S. App. LEXIS 4127 (6th Cir. Feb 21, 2025). And, in any event, when
construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has
alleged that he suffers from a disability. Plaintiff identifies that he "suffers from autism
spectrum disorder, attention deficit hyperactivity disorder, and post traumatic stress disorder."
(ECF No. 33 at PageID 158.)

statutorily prohibited discrimination." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir.

2014).

Plaintiff alleges he engaged in protected activity by "attempting to retrieve his service

animal/emotional support animal" and "calling and contacting officials, writing letters, texting,

and communicating." (ECF No. 33 at PageID 169.) And in his opposition to the Motion to

Dismiss, Plaintiff says his protected activity was his "numerous efforts to get his dog back."

(ECF No. 46 at PageID 254.) But Plaintiff never explains how he was opposing "statutorily

prohibited discrimination" with these actions.[23] (*See* ECF No. 33.) Plaintiff engaged in these

actions to retrieve Bully. But when ACO West adopted out Bully, neither he nor the County

knew Plaintiff was disabled or that Bully was an alleged service dog. So it is impossible that

officials engaged in discrimination by adopting out Bully or that Plaintiff reasonably thought

officials acted discriminatorily in adopting out Bully. *Johnson v. City of Wakefield*, No. 24-

1795, 2025 U.S. App. LEXIS 5816 at *3–4 (6th Cir. Mar. 12, 2025) (explaining that to show

intentional discrimination, a plaintiff must allege that "animus against the protected group was a

significant factor in the position taken by municipal decision makers").[24] Plaintiff therefore was

---

[23] Title II, which applies to public entities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In response to the Motion to Dismiss, Plaintiff states, "Defendant is correct that his complaint does not allege that he was engaged in a protected activity when [the] dog was taken." (ECF No. 46 at PageID 254.)

[24] In his response to the Motion to Dismiss, Plaintiff finally raises the possibility of discrimination. (ECF No. 46 at PageID 255.) In fact, he states that when he was trying to get the dog back, "it was then that the discrimination actions began." (*Id.*) Even if the Court had to consider this allegation as part of the Amended Complaint, it does not cut it. It is a baldly conclusory statement, with no underlying facts, meaning it is not well pleaded. *Iqbal*, 556 U.S. at 678. Moreover, Plaintiff's argument here makes it seem that the alleged discriminatory actions followed the alleged protected activity, rather than the discriminatory actions preceding the alleged protected activity. So Plaintiff still fails to state a protected activity.

not opposing statutorily prohibited discrimination when he tried to retrieve Bully. So these efforts do not qualify as protected activity.

### B.      Knowledge of the Protected Activity

To allege retaliation, Plaintiff must also plead that he "engaged in protected activity that the defendants were aware of." *Harmon*, 2025 U.S. App. LEXIS 13997 at *9. While Plaintiff's actions were not protected under the ADA, Plaintiff does plausibly allege that the County knew he was contacting them to try to reclaim Bully. And the County concedes that it was aware of this activity. (ECF No. 36-1 at PageID 197 ("Here, Plaintiff fails to plead sufficient facts to support the first, third, and fourth elements of his retaliation claim.").) As there is no dispute, the Court finds that Plaintiff plausibly alleged this part of the claim and turns to the third element.

### C.      Adverse Action and Causal Connection

The Court addresses the third and fourth elements together. As shown below, Plaintiff fails to allege these elements. For the third element, Plaintiff needs to allege that Fayette County took an adverse action against him. *Harmon*, 2025 U.S. App. LEXIS 13997 at *9. "Adverse action" means a retaliatory action that is "enough to dissuade a reasonable person from engaging in the protected activity." *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013). Further, "petty slights or minor annoyances" are not adverse actions. *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 584 U.S. 53, 68 (2006)).

For the fourth element, Plaintiff must allege a "causal connection between the protected activity and the adverse action." *Harmon*, 2025 U.S. App. LEXIS 13997 at *9. Proving causal connection requires more than showing that one action followed another. *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 531 (6th Cir. 2020) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010)) ("[T]emporal proximity, standing alone, is not

27

enough to establish a causal connection for a retaliation claim."). Instead, one asserts causal connection by showing that "but for" the protected activity, the County would not have taken the adverse action. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015).

It is unclear what Plaintiff alleges the adverse action to be. If Plaintiff asserts that the adverse action was ACO West adopting out Bully or refusing to return Bully to him,[25] Plaintiff's claim fails on the causation element. Indeed, the new family adopted Bully before Plaintiff contacted the Sheriff's Office—the alleged protected activity.

But it seems that Plaintiff asserts that other conduct amounted to adverse actions. Plaintiff claims the County acted adversely by "cover[ing] [ACO West's] errors, and fabricat[ing] out of state law as the basis for refusing to comply with state law." (ECF No. 33 at PageID 169.) Plaintiff adds that the County injured him or discriminated against him by "disregarding the law, making up requirements wholecloth, requiring him to text with officers, telling him falsehoods on the phone, and then asking him to find comfort that the dog was with a good (anonymous) family."[26] (ECF No. 46 at PageID 255; ECF No. 33 at PageID 165.)

First, several of Plaintiff's allegations are unclear or conclusory. And Plaintiff's other allegations do not sufficiently plead an adverse action. Indeed, the Court finds as a matter of law that none of the adverse actions that Plaintiff alleges would dissuade a reasonable person from trying to collect his dog. Put differently, County officials texting with Plaintiff, telling Plaintiff

---

[25] In the Complaint Plaintiff alleges that he "suffered adverse actions when West, in violation of state law, county ordinance, Sheriff Riles' representations, and his own rules, made his own custom and policy of when the dog was adopted out and how." (ECF No. 33 at PageID 169.)
[26] The Court need not consider any alleged adverse actions that Plaintiff mentioned only in his response to the Motion to Dismiss. *Bray*, 97 F.4th at 410. But the Court briefly addresses them anyway to exhaust Plaintiff's argument.

28

his dog is with a good family, or sending him out-of-state case law do not qualify as adverse actions.

Plaintiff also argues that the County disregarded the law after Plaintiff "engaged in protected activity, which was to require Fayette County to follow the law and return his dog to him." (ECF No. 46 at PageID 254–55.) But this statement is conclusory. And moreover, this claim is defeated by Plaintiff's own recounting of events—he alleges that ACO West "notified the family in possession of the dog and 'asked if they wanted to keep the dog or give him to Mr. Dotson if he could prove the dog was his.'" (ECF No. 33 at PageID 163.) Contrary to Plaintiff's assertion, ACO West's conduct did not violate the law. *See* Tenn. Code Ann. § 68-8-107. And, simply put, this conduct does not arise to an adverse action.

In the end, at best for Plaintiff, the actions that followed his alleged protected activity amount to petty slights or minor annoyances. Indeed, by the time Plaintiff contacted the Sheriff, Bully was already adopted.

The Court therefore **DISMISSES** Plaintiff's retaliation claim **WITH PREJUDICE**.

### III.    State Law Claims

Plaintiff brings several state-law claims and asks the court to exercise supplemental jurisdiction over them. The state-law claims include a tort claim for the loss of personal property, a tort claim for the intentional infliction of emotional distress, and a violation of the Tennessee Open Records Act. (ECF No. 33 at PageID 170–71.) Supplemental jurisdiction arises when state-law claims "are so related to claims in the action with [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Hucul Adver., LLC v. Charter Twp. of Gaines*, 748 F.3d 273, 280 (6th Cir.

2014) (quoting 28 U.S.C. § 1367(a)).  "Claims form part of the same case or controversy when they 'derive from a common nucleus of operative facts.'"  *Id.* (citation omitted).

Plaintiff brought a § 1983 and ADA claim here.  (ECF No. 33.)  Both are federal statutes which give this Court original jurisdiction.  *See* 29 U.S.C. § 1331.  So the Court may exercise jurisdiction over the federal and related state-law claims because they arise out of a "common nucleus of operative facts."  All of Plaintiff's claims arise from Bully's escape and later adoption.  (*Id.*)

That said, a court may decline jurisdiction when it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  In fact, "[o]nce a federal court no longer has federal claims to resolve, it 'should not ordinarily reach the plaintiff's state-law claims.'"  *Southard v. Newcomb Oil Co., LLC*, 7 F.4th 451, 455 (6th Cir. 2021) (citation omitted).  Because, as discussed above, the Court dismisses Plaintiff's § 1983 and ADA claims, the Court now declines to reach Plaintiff's state-law claims and **REMANDS** the state-law claims to Fayette County Circuit Court.

## CONCLUSION

For the reasons explained, the Court **GRANTS** the Motion to Dismiss.  The Court **DISMISSES WITH PREJUDICE** Plaintiff's § 1983 and ADA claims.  The Court **REMANDS** Plaintiff's state-law claims to Fayette County Circuit Court and respectfully **DIRECTS** the Clerk to effectuate the remand.  Lastly, the Court **DENIES** Plaintiff's request for a temporary restraining order as **MOOT**.

**SO ORDERED**, this 22nd day of August, 2025.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE